We'll proceed to the next case on the oral argument calendar for this morning, Carrasco v. San Ramon Valley Unified School District. Good morning. If it pleases the court, my name is John Scott. I represent Laura Carrasco, the plaintiff and appellant in this case. I would like to hopefully emphasize some points that were made in the briefs and hopefully not repeat things. But perhaps emphasize or help the court look at things now in perhaps a different light, if I may. First of all, I think very important to this case, of course in any of these cases, is all context and everything happens within a context. And I think in the big picture, the context where this case starts is Laura Carrasco had worked for the school district since 1983. And up until the fall of 2002, she had an unblemished career. She had been promoted. She was highly regarded. She only had excellent evaluations. And then she gets involved in a petition, and because of her association with Mary Glenn, an African-American woman who was her immediate supervisor and who was being investigated, literally the wheels fell off. And she was subjected to a series of allegations of misconduct, which ultimately resulted in her termination. And I think the district court got that big picture right, that her termination could be linked, at least the district court saw it as being linked, to the October petition. However, it was kind of the district court, I believe, took a narrow analysis of the petition and found that it was, if anything, if it was protected, it was only protected by the First Amendment, because there was an allegation of $80,000 expense that was in question. But the district court, in my opinion, took a very narrow view of, number one, the context of the petition. The context in which this petition was made. And, number two, language in the petition from which it could be inferred that she was complaining about discrimination. And I would like to point to, the petition really had two parts to it, and it's in page eight of my opening brief. Number one, the complaint was, you're investigating Mary Glenn for taking gifts, and it's not true. Maybe she didn't say Mary Glenn is an African-American woman, but everybody knew that, certainly the employer knew it. And I believe the teachings of the Traunz-Ellerbach case, and I would urge this court, although it's not bound by the Anowitz decision, I think there's very good reasoning in the Anowitz decision. I think the analysis is, what did the employer know? And the employer knew who Mary Glenn was, and they knew she was an African-American woman, and they also knew that she and Mary Glenn had made a complaint. Of not being fairly paid, comparable to other managers who were whites or males, similarly situated. And then the petition said, some of the custodians said they had given gifts to Thomas Jameson, who they knew was a white male. The employer knew that. And Tony Doria, who was a male, and I'm not sure of his ancestry, who was the custodian before the layoff. So in her complaint, in this petition, and I will get to the issue about the district saying, well, we didn't, some of us didn't know about that Laura Carrasco was connected to this petition. But I will get to that issue. But the basis on which the district court rejected your argument, that there just was no nexus between the circulation of the petition and the disciplinary action? No, I don't think so, Your Honor. The way I read the court's decision, and particularly, I'd like to quote from part of it. It's at page 772 of the excerpts of the record. The court said, part of the ongoing pattern of discipline that commenced in September, October 2002, well before plaintiff complained that the administration was going to do something about it. And that the administration was going against her. But the court found that the record could support an inference that her speech, the petition, was related to the termination. Where are you reading that? I'm looking at line 8 on page 772. Where Judge Breyer is talking about her termination in November of 2003, more than five months after she complained about it. Well, that's the 2003 one. But he did, he didn't, he did indicate that he thought there was a nexus between, if you look up at, if you say that, look at the next part where it says, rather than as part of the ongoing pattern of discipline that commenced in September, October 2002. So the way I read this, Judge Breyer, he starts on page, on line 8. The record does not support a reasonable inference that the termination was caused, even in part, by plaintiff's March 2003 complaint about discriminatory treatment, rather than as part of the ongoing pattern of discipline that commenced in September, October 2002, well before plaintiff complained the administration was discriminating against her. I read that as saying they're unrelated. Am I misreading what Judge Breyer is saying? I believe he is saying that, and my point is that they're very related, and I want to talk to that while they're very related. So there was a nexus problem that the district court found between the argument that you're advancing here, right? Yes. I believe he saw a nexus problem between the March 2003 complaint and the October 2002 complaint. And he also didn't see a nexus between the March 2003 complaint and the termination. And I think he did see a nexus between the October petition and the termination. But I thought one of the problems was that there wasn't any evidence that the decision-makers knew that she had. I was going to get to that point, but if you want me to get to it now, I will. Take it in any order you want. I know I'm throwing a lot at you here. Well, there's a lot to cover here. Yeah. My point simply is, for starters, just on the issue of whether the petition is protected under Title VII, if you draw inferences in favor of the plaintiff this was a motion for summary judgment, one can make a reasonable inference that when this petition says that Mary Glenn is being investigated for accepting gifts, but they identify two men who are engaging in the same conduct, who are also accepting gifts from custodians, are not being investigated, I submit that that can be read within the context, and again, what the employer knew, they knew Mary Glenn was an African-American woman, that can be interpreted as a complaint that is protected by Title VII. But is the strongest evidence that you have to support that the mere race of the parties? No, well, also the gender. I mean, this is a woman and these are men. Yeah. Okay. But in the text of the petition, there's no reference to discrimination. Do you agree with that? Oh, absolutely. Yeah, so we have to ‑‑ it's a fairly high inferential leap just looking at the cold record. Now, in the context of the particular school, it might be different indeed. I understand that. All right. Well, if I'm not going to win this battle, let me move on to some other battles. Okay. All right? Because I don't think I have to win this battle to win the war. Okay. And so if I'm going to lose that battle, let me move on. I'm just asking. You haven't lost yet. We're just trying to make sure we understand your position. Well, my position is essentially twofold. And if I win either argument, I think I should get by summary judgment. Okay. Go to the one that you want to talk to us about then. Well, I wanted to talk to you about the October 8, 2002, because I think within context and within the teachings of the Kahn‑Zellerbach case, is it a reach? Yes, it's a reach. But when we're talking about drawing inferences in favor of a nonproving party to get by summary judgment, it seems to me the issue is not whether you, personally sitting as a juror, would draw that inference. The issue is if you draw inferences in my favor, could a reasonable juror come to that conclusion? On the basis of whatever the admissible evidence is that would be before the jury. And what would be before ‑‑ obviously the petition would be before the jury. It would be before the jury that Mary Glenn is an African‑American woman. It would be before the jury that Thomas Jamison and Tony Doria are men. It would be before the jury that the employer knew that prior to this petition, Mary Glenn had complained about not being paid equally to whites and to men. The employer knew that. And so the question comes down to, with the employer in seeing this petition, could it be inferred that this could be interpreted as a complaint about discrimination as well as a complaint about generally about other issues? And I submit the $80,000 issue, which kind of leaps off the page when you read this, is a First Amendment issue. And I agree that if it is a First Amendment issue, it doesn't fall within Title VII. And it seems to me Judge Breyer was looking at this and seeing it as, if anything, if it was protected at all, it was protected by the First Amendment, not by Title VII. Mr. Scott, we would have to find as a matter of law that those four elements, the petition, the race of Mary Glenn, the gender of the men mentioned in it, and I forgot what your fourth point was, that would be sufficient as a matter of law to support the jury's conclusion that there was a Title VII violation. Well, no, that she's complained that the complaint she's making is about discrimination, unlawful discrimination. In which case she would be then retaliated as a result. Yes. She's complaining of my loss. But we would have to find that that alone is sufficient as a matter of law to permit a reasonable try or a fact to reach that conclusion. Yes. Drawing all inferences in our favor. In your favor. Yes. Drawing all inferences in my favor. Yes, you would. Let me move on. Well, let me move on to the next issue that's related to this, and that is the argument by the defendants that, geez, we didn't know Laura Carrasco was the person who wrote the petition or circulated it. Well, some supervisors did know. Mr. Jamison knew. Mr. Shannon knew. At least there's evidence that it could be inferred that he knew. Other people are saying they didn't know. And now the issue arises, from my point of view, and speaking as a trial lawyer, if you have somebody with an unblemished career, 19 years, everything is fine, you've just got a great evaluation. Now, all of a sudden, this petition comes out in October. You've signed it. Maybe you didn't tell your employer directly that I wrote it and I circulated it, but it's kind of common knowledge about, among all the other custodians, that you wrote it and you circulated it. But you didn't go and tell your employer I wrote it and I circulated it. But almost immediately after this petition gets presented to the school board and the school officials, you start getting hit with criticism and allegations of misconduct. Almost immediately, it's November, December, January, that she gets criticized for supposedly harassing a subordinate, Mr. Ochoa. Then they want to write her up for allowing her son to work overtime on a holiday weekend, or not overtime, but filling in for somebody on overtime weekend. I mean, trivial events that all of a sudden she's a target. Now, I would argue that is circumstantial evidence that they knew. Because otherwise, how do you explain they're going after her for trivial events? And I would submit, if you draw inferences in our favor, there's circumstantial evidence that they have no other reason to explain all of a sudden a model employee, after this petition has been circulated, is now being targeted. And the fact that they say, I don't know, is a disputed fact. And if you draw inferences in our favor, I submit that she engaged in this protected activity. Shortly thereafter, she starts to be targeted with criticism, discipline, et cetera. Is that a coincidence, or is it related to the protected speech? And I would just, I don't really have more to say than that, and that I believe, if you draw inferences in my favor, a jury could find that despite the fact that some of the, not all, but that some of the people who were participating in having her disciplined in that process, simply because they say they didn't know, is not the end of the inquiry. Now, I'd like to move to the March 23rd letter, which I think is really the heart of this case. There seems to be no question the March 23rd letter is protected by Title VII. In fact, the district concedes it. Their witnesses have conceded it. I believe it was Mr. Jamison testified that, well, let me get back to the guts of it. She submits with her March, I'm sorry, March 26th letter. Forgive me for saying March 23rd. Her March 26th letter, she submits a statement from a cafeteria worker, a Ms. Argraz, I think is the pronunciation, who is also Mexican-American. And she is complaining about the fact that now she's being written up and she's about to be investigated or disciplined, because she spent three to five minutes or seven to nine minutes, some period of time, talking with this cafeteria worker, which, again, is a trivial event. And Ms. Argraz submits a letter that Laura Carrasco submits with her complaint that says it's not very articulate, this woman doesn't speak very good English, but she gets the point, and the crust of that letter is it appears to me that we are being singled out and treated differently, because we're Mexican-Americans and we're Mexican-American women. Now, whether that was discriminatory or not, I don't have to prove for purposes of retaliation claim. What I do have to prove is that she in good faith made a complaint of discrimination. But the other thing that's even more revealing, and that came out in the testimony of Mr. Jamison when he was asked about this complaint, and it's quoted at page 20 of my opening brief, he looked at the March 26th letter, and he thought that it was complaining about discrimination because of her association with Mary Glenn, her association with a black man. So it seems to me for at least two reasons, the March 23rd complaint, and the March 26th letter, that it was a complaint of discrimination because the March 23rd complaint is protected by Title VII. And also I think it's interesting, it's interpreted as based on her association with Mary Glenn, and her association with a black woman is protected by Title VII. Then why isn't the, if they knew about the October petition, and if that was her, isn't that also her association with a black woman? And wouldn't that be another, and at some point does the March 26th letter, to a certain extent, do you think it's a complaint of discrimination? I don't think it would bootstrap or buttress the argument that the October petition was also protected by Title VII. But let me get to the heart of this. If I understand the district court's analysis, the district court's analysis was even if this March 26th complaint was one that was protected by Title VII, there's no nexus to that and the termination. And it seems to be, if I'm interpreting it correctly, and it may not be, the argument seems to be that if she was terminated for an unlawful reason, it must have been the petition. And this March 26th letter didn't really change the fact that if there was an illegitimate reason for the termination, it was the petition, not the petition. It was the petition, not the March 26th letter, which I think raises the whole mixed motive issue. And let me put it this way. It seems to me, under mixed motive analysis, there can be two or more reasons for a termination. And if one is legitimate and there's other illegitimate reasons, you get to go to a jury and say, okay, was this, in this case, was the Title VII speech A, not the only one? But was it a motivating factor in the termination? Now, think of this hypothetically. I tried this case to a jury, and let's assume for just very hypothetically, the district, a school district decides to say their defense is going to be, listen, we have all these legitimate reasons to terminate her. Of course, to that I come back and say, listen, in eight years from 97 to 2005, you only terminated two other employees. And what did you terminate them for? You know, theft, drugs, and not showing up for work. And you haven't fired anybody else or anything even approaching, you know, the trivial kinds of things that you went after Mary Glenn for. But aside from that, the district says, no, we have legitimate reasons, we've documented all this poor performance issues. And by the way, we had another reason, and it was the petition. Maybe we fired her because we didn't like the petition. Let's assume the evidence goes in and the district, the attorney for the district says, you know, we had another reason, and we didn't like the petition. But the petition is protected by Title VII. So now they have a great defense. And now I want to come in and say, whoa, wait a minute, under mixed motive analysis, there can be three reasons here. There's another reason they fired her, and that's because of her complaint in March 26th. That was a motivating factor. And if the jury finds that that doesn't have to be the factor, the primary factor, if the jury finds that's a motivating factor, that that was one of the reasons they terminated her because of her complaint that, by the way, they didn't investigate, then it gets to the jury to decide. Was it a motivating factor? And again, the burden shifts to the employer. If the employer wants to, the employer can raise the mixed motive analysis and say, well, I would have done it anyway. And now the battleground becomes, would the employer have terminated her anyway, even if she hadn't made the March 26th complaint? Now, let me explain why I think the March 26th complaint is very significant. It happened in the context, they had just asked her to agree voluntarily to demote, and she didn't. And I submit, and this would be my argument to a jury, if she had agreed to the demotion and just quietly shut her mouth, she would not have been fired. Just shut her mouth, stop complaining, take in the demotion, and just show up for work, keep your mouth shut, be happy you have a job, she wouldn't have been fired. She made that complaint on March 26th in the context of saying, no, I'm not going to accept your demotion. And guess what, I'm going to keep complaining. And because she didn't accept the demotion and she told them, I'm going to keep complaining, that escalated the adversarial relationship between her and the employer. And what did the district do in response to her saying, I'm not going to accept the demotion, and I'm going to keep complaining, and here's my complaint? They fired her. Thank you. Good morning. May it please the Court, Nancy Hoenigke appearing on behalf of the school district. We have two events, as the Court is well aware, on which the retaliation claim is based, and I'm going to take them in reverse order, because counsel for the appellant has told the Court that the March 26th, 2003 letter was the crux of the case. And this is a letter that is sent well after Ms. Carrasco is into the disciplinary process with the district. The district court found that there was no causal relationship between the March 26th letter and the termination for a variety of reasons. And those reasons are that by March 26th, 2003, the disciplinary process had been on the table, and Ms. Carrasco had been fired. The disciplinary process had been ongoing for at least six months. Two months before that letter was presented by Ms. Carrasco, she had signed a last-chance agreement in January of 2003 in which she admitted to several terminable offenses. She fully understood these offenses are under the MOU, all terminable offenses. They were abusive language, incompetence or inefficiency in job performance, and insubordination. Those are all terminable offenses. Perhaps they do seem a little trivial. It may be that it does to you. It was a long and ongoing pattern of difficulty set in a context in which, in fact, these were not trivial offenses, but it is undisputed that they were not. What do you mean by that, that it was in a context in which they were not? Well, it was in a context in which Ms. Carrasco had repeatedly harassed another employee who nearly quit over it. She would not quit harassing this employee. She would not abide by the rules that were set down regarding her relationship with this employee. And these involved job-related matters. I mean, this was whether or not the trash got picked up by this particular employee. And after being informed, in fact, that this particular employee often couldn't pick up the trash because the principal was assigning the employee to do other tasks, and that it was her job to make sure that any trash that remained unpicked up get picked up. So it went to the heart of what her job was as a custodian. And she absolutely would not do that job. She would not accept that directive. So it was an ongoing problem of insubordination and disrespect both to the employee and to the job requirements. I mean, the odd thing on this record, if we're drawing inferences in favor of the plaintiff, is that all this stuff appears after many, many years of good relatively short period of time. Go ahead. That's true. And what happened in September of 2002, there was a restructuring of the janitorial staff, and it created a lot of problems. But there was a new woman who came in who supervised the janitors in 2002. She'd never supervised Ms. Carrasco before, and she had a different view in terms of the relationship and the way men and women would interact with each other. And I think we end up, too, back to where the district court ended up on this issue. If you think that she was terminated for trivial reasons, is there still any nexus to Title VII? And I submit the answer is what the district court supplied her with. And that is no. Because with the March 26th letter, again, she has signed last-chance agreement. She understands as of January 2003, two months before she wrote this letter, as she put it in her own words, the last-chance agreement means if I screw up, I am bye-bye. Yes. No, I don't think there's any doubt about that. I think the question in the case is whether drawing the inferences in favor of the plan, of which we must, is there enough to get to a jury on a mixed motive theory? I mean, not one of the issues, but one of the key issues. Why don't you think that's so? I don't see how you get there from the March 26th letter, because all of these things occurred before that letter. There cannot be a causal link between the March 26th letter and the last-chance agreement, at which point she is already this far away from termination. Now, what the district court said was that she would have been terminated. If she did not abide by the last-chance agreement, she would have been terminated, and that was made clear to her. And she understood it. She said, if I don't abide by this agreement, I'm gone, basically. And so she understood exactly what it meant. So I think the March 26th letter, you cannot, you simply cannot draw a causal link. So then the question is, what inference is left? If you can't say that the March 26th letter contributed to the, if you're drawing all reasonable inferences in favor of the plan, reasonable inferences, what inference could be left by the fact that she was terminated after these, if you want to characterize them as trivial violations of the last-chance agreement? Well, the inference that the district court said is left at most is that they were related to the petition. So we get back to whether the petition itself then represents activity that is protected under Title VII. And the answer to that is, I think, clearly no. So there is no mixed motive that is covered by Title VII. And why couldn't the March 26th letter have colored what the administration was going to consider a violation of the last-chance agreement? Well, a couple of reasons. One is that even prior to the March 26th letter, about a week prior, in fact, they had a meeting with her and said, look, you've been violating the last-chance agreement, here are your options, take a demotion. And she understood this. She said this as well. I understood the demotion was my chance to save my job, and I didn't take that demotion. That's before the March 26th letter. But the other fact that you have is that the termination occurred eight months after that letter was written. Where do you find a link, a reasonable inference, that that letter caused her termination eight months later? So I think we end up again where the district court ended up, which is back at the petition. And if you're going to look at mixed motive, the only possible other motive other than actual job infractions is the petition. That's not covered by Title VII. That's not protected opposition, and it's not because it's her burden of showing that she had a reasonable belief that the practice she opposed in writing the petition was unlawful under Title VII. And what evidence do you consider the most important violations of the last-chance agreement? Well, I don't know that one was any particularly more significant than the other. I think probably in the district's mind it was a complex of issues that resulted in one fact that they could not get Ms. Carrasco to do her job. And follow their directions. So I guess if you... No, I don't think it was any one. I mean... Well, again, I don't think it was any one item that did it. This all added up and amounted to basically the same thing, and that is that she would not do her job and would not follow directives. She was told, for example, specifically, do not hire your son as a substitute. She did. She was told specifically... She was told that before she hired him? She was told that after, and then she did it again. She was specifically told no one but district personnel, certain district personnel, can authorize overtime. After she knew that, she authorized overtime for herself, she authorized overtime for five other employees. She was told, you're disrupting people in the cafeteria, we've had complaints, don't go into the cafeteria and talk to people. She did it. And she says, well, I was just told not to go into the cafeteria, so it was okay if I went into the kitchen. I mean, so just time and time again, there were violations of very specific instructions not to do something. And then there was the whole complex of the problem with the other janitor, Mr. Ochoa, which was very frustrating as well for the district. Because she would not leave that alone. She would not leave the whole trash issue alone, even after it was explained to her on multiple occasions what her job was in that particular piece of it. So again... What was the relationship between those two? Was Ochoa her supervisor? No. There were two day shift custodians, Mr. Ochoa and Ms. Carrasco. Mr. Ochoa worked an earlier day shift, 5.30 to 2.30, something like that, or 5.30 to 2. And she worked, I believe, 10 to 6.30. When Mr. Ochoa, because school personnel, the principal and the assistant principal were really the direct supervisors of the custodians. And because they were present during the day, they had more direct supervision over Mr. Ochoa than did Ms. Carrasco. Ms. Carrasco, who was the head of the custodians, had partial supervisorial duties over Mr. Ochoa. So head didn't mean head? I'm sorry? Head custodian didn't mean head custodian? It did when it came to the night shift more than to Mr. Ochoa. There was a night shift, and her shift intersected some with the night shift. And so she was much more responsible for telling the night shift, this is what needs to get done on your shift. Whereas with, that was her job duty, make sure people know what to do on their shift. Whereas with Mr. Ochoa, because the principal and the vice principal were on the scene, they would often assign job duties to him, separate and apart from picking up the trash or things like that. So, yes, head custodian meant head custodian more so for the night shift. Well, now I'm having trouble understanding the trash deal. What's the problem between the two of them? There was an employee who helped Mr. Ochoa pick up trash. That employee was laid off during this general restructuring of the janitorial department. Ms. Carrasco then refused to assign anybody else to help Mr. Ochoa pick up trash. What's wrong with that? That's fine. Okay. You said the principal's got me doing more important things. That's basically right. That's what the principal said. Look, I've got him doing more important things. My order's trump yours, and so if he doesn't get the trash picked up, you know, see to it. That's part of your job. So then what happened? So she continued to complain about the trash being picked up. On several occasions they would call her in and say, why didn't X get done, something unrelated to the trash. And instead of responding, she starred in on the trash issue and how Mr. Ochoa wasn't picking up the trash. Well, he wasn't picking up the trash. I mean, that's the odd thing. It was his job. He gets prevented from doing his job, essentially, by the principal. She says, well, he needs to do his job, and they say, well, that doesn't matter. You know, you're responsible for his failures, essentially, and therefore you have to burn it. You know, this may or may not be relevant, but I can understand her frustration, I guess. Well, but it wasn't his job, necessarily. I mean, it was the job of the entire custodial staff to see that the trash got picked up. That meant if one person got called away to do something else, somebody else picks up the trash. I mean, so that's the way it worked. I mean, the question was whether all this change indicates pretext or not. I mean, that's the issue. What inferences we can draw from the record. Well, I don't see how you draw inferences from that. Again, you have to have an event, this retaliation, and you have to have an event that that hinges on. And there are two events alleged in this case, and one is the petition itself and the other is this March 26th letter. Well, all of these problems with Mr. Ochoa, all of her discipline as a result of these problems and her other failures to follow directions and her failure to, you know, her failure to follow direction not to go talk to the cafeteria workers, her failure to follow directions not to assign overtime, all of those things that occurred before the March 26th letter. So I don't see how you draw any inference from the March 26th letter about if you say those are trivial things, well, they were trivial before the March 26th letter. And those things led to a last-chance agreement, which they said your job is on the line over these things. So I don't think saying they're trivial, whether you characterize them that way or not, adds anything to the discussion of whether you have a mixed motive case. If they were trivial before or after March 26th, they were. I think the way it comes into play is if, you know, it's not atypical for job sites to have very specific rules. It's not atypical for someone to have some problems in saying, okay, now we're going to have to enforce these rules. The question is if you start enforcing them differentially and there's a reasonable nexus to a protected activity, then that's the question, I think. Well, again, though, those rules, if you say they're enforced differentially, which, by the way, there's no evidence of that. There is no unseemly situation. Yeah, I understand. But if you say that, it still all occurs before the March 26th letter, which is the event upon which the retaliation is to hinge. So, again, you're thrown back to the, well, is it related to the petition? Well, the problem with the petition is that it's not Title VII protected activity for a variety of reasons that the district court went into, because there's nothing in the letter itself that mentions discrimination. And tellingly, she's not going to say that. The March 26th letter occurred before the termination. Yes, sir. So the termination had it based upon things that were in violation of the agreement, right? That is correct. So if those things were trivial, does that lead to an inference that it was because of the March 26th letter? I don't see how it does. Let's just say the jury believes everything was trivial. Right. So you have a subset of trivial things, and then you have a big set of trivial things. And I don't know that that matters, particularly since you have the termination occurring eight months after that letter is written. I don't see how a reasonable inference can be drawn that that letter was, played any role in the termination. Mr. Ochoa is still employed by the district, I gather? As of the date I wrote this brief, he was. But I'm not sure. And is he now head custodian? No, he was not head custodian. So. Is he picking up the trash? Impossible. That's the principle of signs and notes. Thank you for your argument. Mr. Scott, you used up all your time on your opening remarks, but I think we have the case well in hand. The case just heard will be submitted.
judges: Hug, Thomas, Tallman